**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANACOSTIA RIVERKEEPER, INC.,<br>515 M St SE, #218<br>Washington, DC 20003;<br><br>KINGMAN PARK CIVIC ASSOCIATION<br>1913 D Street, NE<br>Washington, DC 20002;<br><br>and<br><br>POTOMAC RIVERKEEPER NETWORK<br>1615 M St. NW, 2nd Floor<br>Washington, DC 20036;<br><br>                *Plaintiffs*,<br><br>   v.<br><br>GINA McCARTHY, Administrator, U.S.<br>Environmental Protection Agency, in her<br>official capacity,<br>1200 Pennsylvania Ave., NW<br>Washington, DC 20460;<br><br>and<br><br>UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY<br>1200 Pennsylvania Ave., NW<br>Washington, DC 20460,<br><br>                *Defendants*. | Civil Action No. _____<br><br><br>**COMPLAINT FOR**<br>**DECLARATORY AND**<br>**INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      This suit challenges the approval by the United States Environmental Protection

Agency and its Administrator (collectively, "EPA"), of total maximum daily loads for the fecal

1

bacteria E. coli in the Anacostia River, the Potomac River, Rock Creek, and their tributaries ("TMDLs"). EPA's approval actions are contained in a series of letters from Jon M. Capacasa, Director of the EPA Region 3 Water Protection Division, to Hamid Karimi, Deputy Director of the Natural Resources Administration of the D.C. Department of the Environment, dated July 25, 2014 and December 31, 2014, respectively. *See* Ex. A - G.

2.      Particularly after rain storms, fecal bacteria levels in the waters in Washington, D.C., rise high. Though water quality standards require the Potomac and Anacostia River, as well as other waters like Rock Creek, to be safely usable for swimming, kayaking, rowing, and wading, it is highly dangerous to do so when there is a spike in fecal bacteria levels. That is because those activities put people in direct contact with the water (and the elevated levels of fecal bacteria it contains), leading them to sometimes even swallow the water as it splashes on their faces, and even brief exposures to high fecal bacteria levels can cause, for example, gastroenteritis, with vomiting, indigestion, diarrhea, and fever, as well as earaches, pink eye, rashes, and skin infections. One way the Clean Water Act is supposed to protect people like Plaintiffs' members against this harmful water pollution is through TMDLs, which must implement water quality standards, with an adequate margin of safety. For the reasons detailed in this complaint, each of the challenged TMDLs fails to implement all the applicable water quality standards with an adequate margin of safety. In addition, certain elements of the Potomac River TMDLs were adopted and approved absent compliance with public participation requirements.

3.      EPA's approval of the TMDLs contravenes the agency's authority and statutory duties under the Clean Water Act, 33 U.S.C. § 1313(d), and is arbitrary and capricious and subject to vacatur under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C), (D).

4.       Plaintiffs' injuries would be redressed by an order of this Court declaring EPA's

approval action unlawful, vacating EPA's approval of the fecal bacteria TMDLs, and staying the

effect of the vacatur for no more than one year to allow EPA to approve or promulgate legally

adequate TMDLs. Although Plaintiffs believe that the flaws in the TMDLs are so serious they

require vacatur, Plaintiffs oppose immediate vacatur of the TMDLs because leaving the

District's surface waters without fecal bacteria TMDLs would have an immediate adverse impact

on the Plaintiffs' ability to protect their health and recreational interests.

**PARTIES**

5.       Plaintiff Anacostia Riverkeeper, Inc. is a not-for-profit corporation existing under

the laws of the District of Columbia, with its principal place of business in Washington, D.C.

Anacostia Riverkeeper is dedicated to advocating for a clean and healthy Anacostia River,

engaging in efforts to protect and enhance water quality in the river, and enforcing existing

federal and state laws governing the water quality, and educating the public about issues

affecting the Anacostia River.

6.       Plaintiff Kingman Park Civic Association ("KPCA") is a longstanding association

of residents who live in the Kingman Park neighborhood, which sits adjacent to the Anacostia

River. KPCA works to conserve and restore the environment in the Kingman Park neighborhood

for the benefit of its members, and to help its members feel connected to their environment.

7.       Plaintiff Potomac Riverkeeper Network is a not-for-profit corporation existing

under the laws of the State of Maryland. Potomac Riverkeeper Network is dedicated to

protecting, conserving, and restoring the Potomac River and its watershed, and ensuring public

access to a fishable, swimmable Potomac River. Potomac Riverkeeper Network engages in

active scientific monitoring of water quality and works to ensure that the Potomac River and its tributaries are being properly regulated and protected by applicable federal and state laws.

8.      Plaintiffs are membership organizations with members and staff who use and enjoy the Anacostia River, Potomac River, and their tributaries for recreation that involves them contacting the water, such as kayaking and canoeing, wading, and swimming, as well as wildlife watching and other means of aesthetic enjoyment. Plaintiffs Anacostia Riverkeeper and Potomac Riverkeeper Network actively participated in the development of the TMDLs through the submission of public comment, and Plaintiff Kingman Park Civic Association (along with others) has long fought to ensure that protective TMDLs for these waters be established, *see, e.g.*, *Kingman Park Civic Ass'n v. EPA*, 84 F. Supp. 2d 1 (D.D.C. 1999); *see also Anacostia Riverkeeper v. Jackson*, 798 F. Supp. 2d 210, 218 (D.D.C. 2011) (explaining how *Kingman Park Civic Association* decision led to District of Columbia beginning to develop TMDLs). Plaintiffs' members suffer recreational and aesthetic injury from fecal bacteria pollution afflicting the waters of the District of Columbia, which will be prolonged because of the substantive and procedural defects in the EPA-approved TMDLs.

9.      Defendant United States Environmental Protection Agency is the federal agency responsible for supervising the implementation of the Clean Water Act's requirements in the District of Columbia.

10.     Defendant Gina McCarthy is the Administrator of the United States Environmental Protection Agency. She is charged with the supervision and management of all decisions and actions of that agency, including those taken pursuant to the Clean Water Act with respect to the District of Columbia. She is being sued in her official capacity only.

4

## JURISDICTION AND RIGHT OF ACTION

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 and 1361. *Friends of the Earth v. EPA,* 333 F.3d 184, 189 (D.C. Cir. 2003) ("original

jurisdiction over EPA actions not expressly listed in section 1369(b)(1) lies… with the district

court").

12.     This Court can issue a declaratory judgment and grant further relief pursuant to 5

U.S.C. §§ 702 and 706 and 28 U.S.C. §§ 2201 and 2202. Plaintiffs have a right to bring this

action pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701 through 706.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because

Defendants' official residence is in the District of Columbia.

## LEGAL FRAMEWORK

**Legal Requirements For TMDLs**

14.     Congress enacted the Clean Water Act in 1972 to "restore and maintain the

chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The

goal of the Clean Water Act is to eliminate "the discharge of pollutants into the navigable

waters," and in the interim, to attain "water quality which provides for the protection and

propagation of fish, shellfish, and wildlife and provides for recreation in and on the water." 33

U.S.C. § 1251(a)(1) and (2).

15.     To achieve these ends, the Clean Water Act requires each state and the District of

Columbia to establish and implement water quality standards, subject to review and approval by

EPA. 33 U.S.C. § 1313(a) to (c); *see also id.* § 1362(3) (defining "state" to include District of

Columbia).

5

16.     Water quality standards consist of the "designated uses" of a state's waters (such as drinking water, swimming, and wildlife habitat) and "the water quality criteria for such waters based upon such uses," and "shall be such as to protect the public health or welfare, enhance the quality of water and serve the purposes of [the Clean Water Act]." 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. § 130.2(d). Water quality criteria can be expressed numerically or narratively, 40 C.F.R. § 131.11(b), meaning that water quality standards can themselves be numerical or narrative.

17.     Though the Clean Water Act depends in part on technology-based effluent limitations issued under Section 1311(b)(1)(A)-(B) to help states achieve water quality standards, the Act further requires each State to "identify those waters within its boundaries for which" those technology-based effluent limitations "are not stringent enough to implement any water quality standard applicable to such waters." 33 U.S.C. § 1313(d)(1)(A).

18.     For the waters thus identified, "[e]ach State shall establish… the total maximum daily load, for those pollutants which the Administrator identifies under section 1314(a)(2) … as suitable for such calculation." 33 U.S.C. § 1313(d)(1)(C).

19.     Pursuant to Section 1314(a)(2), EPA has identified "[a]ll pollutants" as being suitable for TMDLs. 43 Fed. Reg. 60665 (Dec. 28, 1978).

20.     The Clean Water Act thus requires that "TMDLs shall be established for all pollutants preventing or expected to prevent attainment of water quality standards." 40 C.F.R. § 130.7(c)(1)(ii); *see also* 33 U.S.C. § 1313(d)(1)(C).

21.     Section 1313(d) further provides that TMDLs "shall be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." 33 U.S.C. § 1313(d)(1)(C).

22.     EPA's regulations likewise provide that "TMDLs shall be established at levels necessary to attain and maintain the applicable narrative and numerical [water quality standards] with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality. Determinations of TMDLs shall take into account critical conditions for stream flow, loading, and water quality parameters." 40 C.F.R. § 130.7(c)(1).

23.     Under EPA's regulations, a TMDL is "[t]he sum of the individual [wasteload allocations] for point sources and [load allocations] for nonpoint sources and natural background." 40 C.F.R. § 130.2(i).

24.     A "point source" is a discharge through a discrete pipe or conveyance, such as from industrial and sewage plants. 33 U.S.C. § 1362(14).

25.     "Nonpoint source" pollution results from diffuse sources that deliver pollution to surface waters via overland runoff or subsurface drainage.

26.     A wasteload allocation is "[t]he portion of a receiving water's loading capacity that is allocated to one of its existing or future point sources of pollution." 40 C.F.R. § 130.2(h). "Loading capacity" means the "greatest amount of loading that a water can receive without violating water quality standards," and "loading" means "to introduce matter … into a receiving water." *Id.* § 130.2(e)-(f).

27.     A load allocation is "[t]he portion of a receiving water's loading capacity that is attributed either to one of its existing or future nonpoint sources of pollution or to natural background sources." *Id.* § 130.2(g).

28.     As the wasteload allocations established by TMDLs constitute a type of water quality-based effluent limitation," *id.* § 130.2(h), they are implemented through point source

7

discharge permits required by Section 1342. The load allocations established by TMDLs are implemented through water quality management plans required by Section 1313(e)(3)(C).

29.     TMDLs are thus a crucial component of the framework established by the Clean Water Act to protect the nation's waters. In waters with ongoing water quality impairments, TMDLs provide an important technical basis for determining adequate effluent limits in Clean Water Act permits for point sources to ensure that discharges do not contribute to violation of water quality standards.

30.     In addition to the daily loads themselves, the TMDL development process generates crucial information about an impaired water body's baseline and projected future conditions, enabling advocacy groups and members of the public to understand the particular local needs and challenges involved in implementing the TMDLs and improving water quality. TMDLs serve as an essential tool for coordinating state efforts to reduce pollution from unregulated "nonpoint" sources. TMDLs also provide a tool for independent third parties to monitor the status of water quality restoration efforts and to check compliance with Clean Water Act-mandated water quality standards.

**Applicable Water Quality Standards For Fecal Bacteria In The District Of Columbia**

31.     The District's regulations include several water quality standards that apply to fecal bacteria.

32.     All of the water bodies covered by the bacteria TMDLs are designated as Class A, meaning they are intended to be clean enough for primary contact recreational uses. 21 DCMR § 1101.1, 1101.2. Primary contact recreation includes "those water contact sports or activities that result in frequent whole body immersion or involve significant risks of ingestion of the

water." *Id*. § 1199.1. As noted above, designated uses are a type of water quality standard that must be implemented through TMDLs.

33.     All surface waters of the District are also subject to a narrative prohibition against "substances in amounts or combinations that... [c]ause injury to, are toxic to, or produce adverse physiological or behavioral changes in humans, plants, or animals." *Id*. § 1104.1(d).

34.     The narrative prohibition applies for fecal bacteria because even brief exposure to significant concentrations of fecal bacteria and associated pathogens is associated with illness or injury to humans, including vomiting, indigestion, diarrhea, and fever associated with gastroenteritis, as well as earaches, pink eye, rash, infected cuts, and respiratory symptoms.

35.     Class A waters are subject to two numeric criteria. The first is a maximum 30-day geometric mean value of 126 MPN/100 mL, to be based on five samples taken within the 30-day period. *Id.* § 1104.8, Table 1. "MPN" is "a statistically derived estimate of the "Most Probable Number" of bacteria colonies in a volume of one hundred milliliters (100 mL) water sample." *Id.* § 1199.1. A geometric mean is a type of mean or average and is defined as the $n$th root of the product of $n$ numbers. For example, the product of five samples measuring 50, 50, 50, 50, and 5,000 respectively (50 x 50 x 50 x 50 x 5,000) is 31,250,000,000, and the fifth root of that figure is 125.59. As this example illustrates, an enormous concentration of fecal bacteria can be present in a single sample without causing an exceedance of the 30-day geometric mean criterion.

36.     The second numeric criterion applicable to Class A waters is a single sample value of 410 MPN/100 mL. *Id*. § 1104.8 tbl.1.[1]

---

[1] The single sample value is followed by a footnote stating that "[t]he geometric mean criterion shall be used for assessing water quality trends and for permitting. The single sample value criterion shall be used for assessing water quality trends only."

37.     Since at least 1986, EPA guidance documents have consistently recognized that a 30-day geometric mean alone is not sensitive to short-term spikes in bacteria concentrations. Therefore, particularly for heavily-used aquatic recreation areas, EPA recommends that water quality criteria include a second (usually higher) concentration level to address short-term exposures. EPA has provided clear direction on how to calculate criteria that achieve the same level of protection (*i.e.* the same chance of human illness) as the 30-day geometric mean criterion.

## GENERAL ALLEGATIONS

**Sources and Effects of Bacteria in District of Columbia Surface Waters**

38.     As of 2014, the most recent year for which there is a water quality report, the District's rivers and streams used for human-contact recreation frequently violate the criteria for fecal bacteria. The District's 2014 water quality report to Congress and EPA includes data showing that fecal bacteria concentrations in some District waters exceed the criteria between approximately 4 and 42 percent of the time.

| Segment[2] | Percent of time water quality violated E. coli criteria |
|---|---|
| Anacostia River 01 | 19.23% |
| Anacostia River 02 | 29.17% |
| Watts Branch of Anacostia R. | 41.80% |
| Chesapeake & Ohio Canal | 11.69% |
| Potomac River 01 | 10.42% |

---

[2] The data in this table come from the District Department of the Environment's 2014 Integrated Report to the U.S. EPA and Congress Pursuant to Sections 305(b) and 303(d) of the Clean Water Act, available online at: http://doee.dc.gov/publication/integrated-report-epa-and-us-congress-regarding-dcs-water-quality (last visited 8/6/16). Although not specified, the data appears to reflect exceedances of the 30-day geometric mean criterion; the single sample value is not mentioned or discussed in the report.

| Potomac River 02 | 12.50% |
| Potomac River 03 | 6.52% |
| Rock Creek 01 | 41.18% |
| Rock Creek 02 | 40.00% |
| Tidal Basin | 4.35% |

39.     Some of the primary sources of fecal bacteria in District waters are the municipal separate storm sewer system ("MS4"), the Blue Plains waste water treatment plant, and the associated combined sewer overflow system, which is connected with Blue Plains.

40.     Fecal bacteria discharges from all of these sources are largely driven by precipitation. When rain falls or snow melts, fecal bacteria from pet waste and wildlife is washed off streets and fields and collected by the District's MS4 system, to be discharged directly into streams via hundreds of outfalls located throughout the District. Such precipitation events also cause untreated human waste flushed from office and residential buildings to be discharged directly into streams through a series of combined sewer outfalls located within the Anacostia River, Potomac River, and Rock Creek watersheds.

41.     In addition, during both dry weather and wet weather conditions, the Blue Plains wastewater treatment plant regularly discharges fecal bacteria in its treated effluent.

42.     Because periods of prolonged or intense precipitation in the District largely coincide with the outdoor recreational season, District residents and visitors are frequently at risk of moderate to severe illness when they use and enjoy the District's waters for kayaking, canoeing, and other such popular aquatic recreational activities.

43.     The District's combined sewer overflow system is subject to a Long Term Control Plan ("LTCP") as required by the Clean Water Act, 33 U.S.C. § 1342(q), and EPA's 1994 CSO Control Policy, 59 Fed. Reg. 18,688 (Apr. 19, 1994).

**The Predecessor TMDLs**

44.     In 1996 the District formally recognized that its surface waters were not suitable for human-contact recreation due to the presence of dangerous concentrations of fecal bacteria. Today, due in large part to the regular and ongoing presence of high fecal bacteria concentrations, none of these waters meet the District's water quality standards for the protection of human health.

45.     Despite the recognition that many of its surface waters were failing to meet water quality standards in 1996, the District failed to submit any TMDLs to EPA until compelled to do so by a citizen suit and the resulting consent decree. *See Kingman Park Civic Ass'n. v. EPA*, 84 F. Supp. 2d 1 (D.D.C. 1999).

46.     In 2003, draft fecal bacteria TMDLs were released for public comment by the District Department of Health, a predecessor agency to the District Department of the Environment ("DDOE").[3] Following public comment, in 2004 the District finalized and EPA approved fecal bacteria TMDLs.

47.     At that time, the District's numeric water quality criteria was based on fecal coliform. Fecal coliform, like E. coli, is a fecal indicator bacteria used to estimate the presence of human pathogens commonly present with fecal contamination.

48.     Among other problems, the 2004 bacteria TMDLs contained only average annual loads rather than daily loads. For this and other reasons, the 2004 TMDLs failed to protect the designated recreational use in connection with short-term recreational exposures.

_____

[3] After EPA approved the TMDLs at issue in this case, DDOE was renamed the District Department of Energy & Environment. Because all of the documents in the administrative record were developed prior to this change, this complaint will use "DDOE" to refer to the Department.

49.    In 2006 the D.C. Circuit ruled that EPA's approval of TMDLs containing only annual or seasonal loads violated the Clean Water Act requirement for "total maximum *daily* loads." *Friends of the Earth v. EPA*, 446 F.3d 140 (D.C. Cir. 2006). At issue in that case were TMDLs for biochemical oxygen demand and total suspended solids for the Anacostia River.

50.    By 2009 neither the District nor EPA had developed or approved daily loads to replace fifteen additional annual or seasonal TMDLs that EPA had approved for District waters after the *Friends of the Earth* case was filed but prior to the D.C. Circuit's ruling. In a memorandum opinion and order dated May 25, 2010, the District Court for the District of Columbia vacated EPA's approval of the 2004 bacteria TMDL on the basis that the TMDL lacked daily loads, staying the effect of the vacatur until December 2014 to allow the District and EPA time to develop and approve revised TMDLs.

**Revised TMDLs Calculated To Meet Only The 30-Day Geometric Mean Criterion**

51.    As discussed in paragraphs 31-36 above, the District's regulations include four distinct but related water quality standards that apply to fecal bacteria: the designated use for primary contact recreation; the narrative prohibition against substances in amounts or combinations that cause injury or other harm to humans; the 30-day geometric mean value of 126 MPN/100 mL E. coli; and the single sample value of 410 MPN/100 mL E. coli.

52.    Of these four, the proposed TMDLs were only designed to meet the 30-day geometric mean criterion for E. coli. *See, e.g.* Ex. A, Decision Rationale at 3, 5; Ex. B, Decision Rationale at 3, 5.

53.    Body contact recreational activities like kayaking, paddle boarding, and swimming typically occur for periods of less than an hour to several hours, and people become

ill from even very brief direct contact with water containing high concentrations of fecal bacteria and associated pathogens.

54.     EPA has acknowledged that short-term spikes in bacteria concentrations that significantly increase the chances of human illness can occur without causing an exceedance of the 30-day geometric mean criterion. EPA, *2012 Recreational Water Quality Criteria* (Oct. 27, 2014), Ex. H at 39 (stating that "[u]sing the [geometric mean] alone would not reflect spikes in water quality because the [geometric mean] alone is not sensitive to them.").

55.     Despite this, the TMDLs do not include wasteload allocations calculated to attain the District's single sample value criterion, 21 DCMR § 1104.8 tbl.1.

56.     EPA in its approval document cited the footnote in the District's regulations stating that the single sample value criterion "shall be used for assessing water quality trends only." *See, e.g.*, Ex. A at 3, n.1. Apparently on this basis, EPA stated that the agency "does not believe that the 410 MPN for a single sample value constitutes an applicable water quality standard for purposes of this TMDL" and thus declined to calculate wasteload allocations to meet it. *Id.*

57.     But the TMDL development process requires the assessment of water quality trends, and the TMDL implementation process facilitates the assessment of water quality. The District's regulations give no indication that implementing the single sample value through TMDLs would be inconsistent with the goal of assessing water quality trends. *See* 21 DCMR § 1104.

58.     In response to Plaintiffs' concerns about the failure to calculate TMDLs that meet the single sample value, EPA claimed that DDOE "has provided an analysis demonstrating that

the allocations in the TMDL would satisfy the single sample value at least 90% of the time." Ex. A at 3, n.1. EPA did not state whether it independently assessed or verified this claim.

59.     However, the District's single sample value contains no allowance for periodic exceedance, much less for allowing exceedances up to 10% of the time.

60.     Even if EPA were correct that the single sample criterion allowed exceedances, EPA did not explain how allowing exceedances of the single sample value for up to three days in a 30-day period is consistent with the District's designated use or narrative criteria for protection of human health during body-contact recreation, given that such recreation occurs over comparatively brief periods of time and that even brief exposures to fecal bacteria cause illness.

61.     The TMDLs also fail to adequately protect against short-term spikes in bacteria levels, which diminish or interfere with the designated use for primary contact recreation, and prevent attainment of the District's narrative criteria prohibiting substances in amounts or combinations that "[c]ause injury to, are toxic to, or produce adverse physiological or behavioral changes in humans." 21 DCMR § 1104.1(d).

62.     EPA claimed that attainment of the 30-day criterion means that the designated use and narrative criteria are also attained. *E.g.*, Ex. A at 6. But EPA nowhere explained why that is the case, citing only a statement in the District's regulations that links attainment of numeric criteria (one of which is the single sample value) with attainment of the designated use. *E.g.*, *id.* (citing 21 DCMR § 1104.8).

**Use of Event Mean Concentrations**

63.     Discharges from the District's combined sewer system and Blue Plains wastewater treatment plant together comprise a major portion of the existing fecal bacteria loads in the District's surface waters.

64.     Data underlying the TMDL development demonstrate that there are substantial variations in bacteria concentrations in the effluent discharged by these sources, from one storm event to another, from one portion of a storm event to another, and from one location to another.

65.     Given that the District's water quality standards aim to protect humans from dangerous pathogens during recreational contact with surface water and that the TMDLs must be total *maximum* daily loads, it is appropriate and necessary for the TMDLs to reflect the highest predicted concentrations that are likely to occur under critical future conditions.

66.     The TMDLs do not reflect the peak or maximum bacteria concentrations that will occur under some conditions. Instead they employed a method of *averaging* bacteria concentrations found in monitored sewage discharges. In particular, for combined sewer overflow outfalls and the Blue Plains wastewater treatment plant, the TMDLs rely on the "Event Mean Concentration," which means the "total mass of pollutants discharged divided by the total flow volume for a monitored storm event." Ex. A at 6.

67.     DDOE explained that it calculated the annual load allocations for all combined sewer overflows as follows:

> [a.]     Obtained the predicted flow volumes from the Potomac [combined sewer overflows] for 1988-1990 under the [long-term control plan] implementation scenario.
>
> [b.]     Multiplied the flow volumes by the [long-term control plan]-based E. coli [Event Mean Concentration] value of 686,429 MPN/100 mL to derive the daily [combined sewer overflows] loads.
>
> [c.].     Calculated the average by summing the loads and dividing by three to derive the annual [combined sewer overflows] allocation for the modeled three year period.

DDOE, *Appendix C, E. coli Bacteria Allocations and Daily Loads for the Potomac River and Tributaries* (Dec. 2014), Ex. I at 4-5; DDOE, *Appendix C, E. coli Bacteria Allocations and Daily Loads for the Anacostia River and Tributaries* (Feb. 2013), Ex. J at 4-5.

68.     DDOE said it used the Event Mean Concentration to develop a "daily load time series" for combined sewer outflows, which it then used to establish daily loads. Ex. A at 8.

69.     DDOE further explained that it calculated the annual wasteload allocations for the two outfalls that discharge effluent from the Blue Plains wastewater treatment plant as follows:

> [a.] Obtained the predicted flow volumes from Outfall 001 and Outfall 002 for 1988-1990 under the [long-term control plan] implementation scenario.
>
> [b.] Multiplied the flow volumes by the [long-term control plan]-based E. coli [Event Mean Concentration] value of 51,250 MPN/100 mL and 126 MPN/100 mL to derive the daily loads from Outfall 001 and Outfall 002, respectively.
>
> [c.] Calculated the average by summing the loads and dividing by three to derive the annual allocation for Outfall 001 and Outfall 002 for the modeled three year period.

Ex. I at 6.

70.     DDOE said that the daily loads for Blue Plains' two outfalls "were calculated using the LTCP-based event mean[] concentration (EMC) for *E. coli* and the WQS, respectively." Ex. A at 9. For Outfall 001, DDOE said the "maximum daily load" was "calculated using the EMC" and the design flow of a treatment facility at Blue Plains. *Id.* For Outfall 002, DDOE said it set the "maximum daily load" for wet weather as "a time-weighted average." *Id.*

71.     Because the risk of human injury or illness from bacteria and associated pathogens increases as bacteria concentrations increase, Plaintiffs in their public comments on the draft TMDLs criticized DDOE's use of average Event Mean Concentrations, which by their nature can *hide* very high concentrations of fecal bacteria discharges from the combined sewage system and Blue Plains wastewater treatment plant.

17

72.     EPA failed to analyze how the spikes in bacteria concentrations that are hidden by the use of Event Mean Concentrations can be allowed without causing exceedances of the 30-day geometric mean criterion.

73.     EPA also failed to analyze how the spikes in bacteria concentrations that are hidden by the use of Event Mean Concentrations can be allowed without causing exceedances of the single sample value.

74.     EPA likewise failed to analyze how the spikes in bacteria concentrations that are hidden by the use of Event Mean Concentrations can be allowed without violating the District's narrative prohibition in 21 DCMR § 1104.1(d).

75.     Despite this, the TMDLs do not include an additional margin of safety to account for the resulting lack of knowledge concerning the relationship between effluent limitations based on Event Mean Concentrations and the resulting water quality.

76.     In response to these concerns, DDOE claimed that the use of Event Mean Concentrations enables the TMDLs to "capture" variable bacteria concentrations "[g]iven the natural variability in storm events." Ex. L at 15.

77.     EPA acknowledged that the TMDLs employ Event Mean Concentrations, rather than peak or maximum daily concentrations, to develop the E. coli allocations for combined sewer overflow outfalls and for the Blue Plains Outfall 001. Ex. A at 5-6.

78.     However, EPA did not explain why the use of Event Mean Concentrations is consistent with the goals or legal requirements of the TMDLs, which must represent *maximum* daily loads while taking into account critical conditions. EPA claimed only that "the approach for calculating the E. coli annual allocations is consistent with the underlying data, assumptions, and modeling of the 2004 TMDL." *Id*. at 5.

**Blue Plains Final Wasteload Allocations Adopted Without Public Notice**

79.     The first draft of the TMDLs for the Potomac River included proposed wasteload allocations for the Blue Plains wastewater treatment plant that were calculated using a statistical multiplier (rather than modeling) based on recommendations in an EPA guidance document.

80.     Based on that approach, the first draft TMDLs included a proposed maximum daily load for Blue Plains of 2.21E+12 MPN, and an average daily load of 1.77E+12 MPN.

81.     DDOE later published a revised draft of the Potomac River TMDLs that took an entirely different approach, this time stating that "[f]or discharges from Blue Plains (outfalls 001 and 002), the wasteload allocation and the maximum daily discharge shall not cause or contribute to an in-stream exceedance of the E. coli standard of 126 cfu/100ml determined by a rolling 30-day E. coli geometric mean." DDOE, *Appendix C, E. coli Bacteria Allocations and Daily Loads for the Potomac River and Tributaries* (May 2014), Ex. M at 9.

82.     Plaintiffs objected to this approach because, among other problems, it does not specify a total maximum *daily load* as required by the Clean Water Act.

83.     The final TMDL took yet another approach, which had not been provided for public comment. The final approved TMDLs include maximum daily loads of MPN expressed as follows:

      a.     Outfall 001: 4.37E+14 (On days when flows exceed operationally allowable influent limits to Outfall 002);

      c.     Outfall 001: 0.00E+00 (On days when no discharge is allowable);

      d.     Outfall 002: 2.47E+12 (On days when wet weather conditions exist); and

      e.     Outfall 992: 1.76E+12 (On days when dry weather conditions exist).

84.     The methodology used to calculate the final approved TMDLs for Blue Plains employed Event Mean Concentrations.

85.     DDOE did not provide an opportunity for the public to review or comment on the final approved wasteload allocations, or the methodology used to calculate them.

## CLAIMS FOR RELIEF

### First Claim For Relief:
### Violation of the Requirements for TMDLs Under the Clean Water Act

86.     All preceding paragraphs are hereby incorporated by reference as if fully set forth below.

87.     The TMDLs are designed only to meet the District's 30-day geometric mean criterion, and expressly omitted loads needed to attain the District's single sample value criterion, which is an applicable water quality standard. 21 DCMR § 1104.8.

88.     The TMDLs fail to protect the designated use for primary contact recreation. 21 DCMR §§ 1101.1, 1101.2, 1199.1.

89.     The TMDLs fail to implement the District's narrative prohibition against "substances in amounts or combinations that... [c]ause injury to, are toxic to, or produce adverse physiological or behavioral changes in humans, plants, or animals." 21 DCMR § 1104.1(d).

90.     Because of their use of Event Mean Concentrations, the TMDLs fail to take into account critical conditions for stream flow, loading, and water quality parameters." 40 C.F.R. § 130.7(c)(1).

91.     The TMDLs lack an adequate margin of safety to account for lack of knowledge concerning the relationship between effluent limitations based on Event Mean Concentrations and resulting water quality.

92.     EPA therefore approved the bacteria TMDLs in contravention of Clean Water Act, 33 U.S.C. § 1313(d).

**Second Claim For Relief:**
**Arbitrary and Capricious Action**

93.     All preceding paragraphs are hereby incorporated by reference as if fully set forth below.

94.     EPA failed to state a non-arbitrary and capricious basis for its contention that the District's single sample value criterion is not an applicable water quality standard for which EPA must establish a TMDL.

95.     EPA failed to state a non-arbitrary and capricious basis for its contention that TMDLs designed to attain the 30-day geometric mean water quality standard satisfies the designated use and narrative water quality standards.

96.     EPA failed to state a non-arbitrary and capricious basis for using Event Mean Concentrations to represent bacteria concentrations from combined sewer overflows and the Blue Plains wastewater treatment plant.

97.     EPA failed to state a non-arbitrary and capricious basis for declining to include an additional margin of safety to account for lack of knowledge concerning the relationship between effluent limitations based on Event Mean Concentrations and resulting water quality.

98.     For all the foregoing reasons, EPA's approval of the fecal bacteria TMDLs is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) and (C).

**Third Claim for Relief:**
**Failure to Provide Notice and Opportunity to Comment**

99.     All preceding paragraphs are hereby incorporated by reference as if fully set forth

below.

100.    The Clean Water Act requires that EPA and the states (including the District)

provide for, encourage, and assist public participation in the development, revision, and

enforcement of any regulation, standard, effluent limitation, plan, or program. 33 U.S.C.

§ 1251(e).

101.    For the Blue Plains wastewater treatment plant outfalls, DDOE developed and

EPA approved the final wasteload allocations, and the methodology for calculating them,

without publishing notice or providing an opportunity for public comment.

102.    The final wasteload allocations for the Blue Plains outfalls were not a logical

outgrowth of the draft TMDLs provided for public comment.

103.    As a result, Plaintiffs were deprived of the opportunity to examine the

methodology and rationale underlying the final Blue Plains wasteload allocations, or to object

the resulting loads, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) and

(D).

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

104.    Declare that EPA's decision approving the bacteria TMDLs is unlawful and

arbitrary for the reasons alleged herein;

105.     Enter an order vacating EPA's approval action in light of the Court's decision, staying that order for one year, and directing that EPA approve or promulgate legally-adequate TMDLs within one year of the Court's order;

106.     Retain jurisdiction over this action to ensure compliance with the Court's decree.

107.     Award plaintiffs their costs of litigation (including attorneys' and expert witness fees); and

108.     Grant such other relief as the Court deems necessary and proper.


DATED: August 15, 2016                          /s/ Jennifer C. Chavez
                                                JENNIFER C. CHAVEZ
                                                DC Bar No. 493421
                                                SETH L. JOHNSON
                                                DC Bar No. 1001654
                                                Earthjustice
                                                1625 Massachusetts Avenue, N.W.
                                                Suite 702
                                                Washington, D.C. 20036
                                                202-667-4500
                                                jchavez@earthustice.org
                                                sjohnson@earthustice.org

                                                *Attorneys for Plaintiffs*